MARYLAND ARMS LIMITED PARTNERSHIP,
Plaintiff-Respondent-Petitioner,

v.

Cari M. CONNELL and Linda J. Connell,
Defendants-Appellants.

Supreme Court

No. 2008AP1700. *Oral Argument: January 6, 2010.*
*—Decided July 7, 2010.*

2010 WI 64

(Also reported in 786 N.W.2d 15.)

302

For the plaintiff-respondent-petitioner there was a brief by *Randy J. Wynn,* West Allis, and oral argument by *Randy J. Wynn.*

For the defendants-appellants there was a brief by *James B. Connell* and *Crooks, Low & Connell, S.C.,* Wausau, and oral argument by *James B. Connell.*

An amicus curiae brief was filed by *William F. White, Clayton P. Kawski,* and *Michael Best & Friedrich LLP,* Madison, on behalf of the Apartment Association of South Central Wisconsin, Inc., the Apartment Association of Southeastern Wisconsin, Inc., the Central Wisconsin Apartment Association, and the Lakeshore Apartment Association, Inc., and oral argument by *Clayton P. Kawski.*

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Maryland Arms Limited Partnership (Maryland Arms),

seeks review of a published court of appeals decision reversing the circuit court's grant of summary judgment, which was in Maryland Arms' favor.[1] The court of appeals remanded the case to the circuit court with directions that summary judgment be entered instead for the defendants, Cari and Linda Connell.

¶ 2. Maryland Arms asserts that under an unambiguous sentence of its residential lease, Cari Connell (Connell) is liable for the damage to her apartment when her plugged-in hair dryer caused a fire. Although Maryland Arms acknowledges that her conduct was not negligent, it contends that Connell is liable because she had "control" of the hair dryer and "but for the acts of this tenant to introduce into this unit the hair dryer that caused the fire," the fire damage would not have occurred. It further contends that the court of appeals erred when it determined that the residential lease was void as an attempt to contravene the public policy expressed in Wis. Stat. § 704.07.[2]

¶ 3. Because the essential principle posed by Maryland Arms, "control," does not appear in the sentence in question and because it is unclear that the parties intended that the conduct here would constitute an "act" that would impose liability on the tenant, we determine that the sentence in the residential lease is ambiguous. Further, the ambiguity is compounded when that sentence is read in the context of the paragraph as a whole, because Maryland Arms' construction of that sentence would render the preceding

[1] *See Maryland Arms Ltd. P'ship v. Connell*, 2009 WI App 87, 320 Wis. 2d 147, 769 N.W.2d 145, reversing an order of the Circuit Court for Milwaukee County, Michael B. Brennan, Judge.

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

sentence surplusage. Thus, we conclude that the terms of the lease do not unambiguously provide that Connell is liable for the fire damage caused in part by her acts of bringing a hair dryer into the apartment and plugging it into an electrical outlet.

¶ 4. Given that our construction of the lease is dispositive, we decline to address whether any lease provision that assigned liability to a tenant for damages not caused by negligent acts or misuse would contravene the public policy set forth in Wis. Stat. § 704.07. Accordingly, we affirm the decision of the court of appeals, albeit on a different rationale.

I

¶ 5. The facts in this case are not in dispute. In 2004, Cari Connell was a 21–year-old student who leased a Milwaukee apartment from Maryland Arms. The lease was guaranteed by Connell's mother, Linda.

¶ 6. On July 7, 2006, Connell awoke to discover a fire in the bathroom of her apartment. She called the fire department and evacuated the building.

¶ 7. According to the fire investigation report issued by the Milwaukee Police Department, the fire originated in Connell's bathroom. The report described the fire as an "accidental fire" and identified a "plugged in hair dryer" as the "cause of fire." The "cause of ignition" was listed as "unintentional," and under the headline "Human Factors Contributing to Ignition," the investigator checked the box labeled "none." The officer issuing the fire investigation report declined to check a box labeled "negligent fire."

¶ 8. Maryland Arms repaired the damaged apartment and presented Connell an invoice totaling $8,533.81. Connell did not pay. According to Connell,

Maryland Arms evicted her in August for failing to pay the bill and subsequently refused to return her security deposit.[3]

¶ 9. Maryland Arms filed suit in Milwaukee County Circuit Court, naming Connell and her mother as defendants. The complaint made no allegations of negligence. It did not contend that Connell mishandled the hair dryer or the electrical outlet in any way that made the hair dryer more likely to malfunction. Rather, it alleged that Connell was liable for the fire damage under the terms of the residential lease.

¶ 10. The complaint demanded reimbursement for the cost of repairing the apartment. It further alleged that Maryland Arms was unsuccessful in its attempts to re-rent the apartment in August 2006 and was therefore entitled to August rent. The complaint stated that Connell and her mother "refuse to pay the amounts referenced herein despite due demand having been made." Maryland Arms attached the lease, the fire investigation report, and a list of itemized damages to the complaint.

¶ 11. Connell's answer asserted that "the fire which damaged [her apartment] was accidental in nature and not the result of negligence." It further contended that neither the lease nor Wisconsin law permitted a claim for damages resulting from an accidental fire not caused by the negligent act of the tenant.[4]

---

[3] In its circuit court filings, Maryland Arms denied that it wrongfully evicted Connell and wrongly withheld her security deposit. Although the parties may dispute the facts surrounding the termination of the lease, these facts are not material to the issues we decide here.

[4] Additionally, Connell counterclaimed, alleging that she was entitled to damages for wrongful eviction and the wrongful withholding of her security deposit. The circuit court entered

¶ 12. The parties entered into a stipulation, agreeing in relevant part to the following facts: Maryland Arms' damages were correctly itemized; these damages were "caused by a fire, the origin of which came from a hair dryer owned by Cari Connell as described in the Milwaukee Police Department Fire Investigation Report"; and "Cari Connell did not previously know of any defect in said hair dryer."

¶ 13. In their briefing and arguments at the circuit court, the parties focused on the terms of the lease signed by Connell, her mother, and Maryland Arms. The residential lease is a nine-page document, including attachments. It provides in relevant part:

> Lessee shall be responsible for all intentional and negligent acts or breaches of this Lease by Lessee, Lessee's occupants, guests and invitees. Lessee shall be liable for all damage to the premises and appliances and equipment belonging thereto, in any way caused by the acts of Lessee, Lessee's occupants, guests and invitees.

Throughout this opinion, we refer to this provision in the lease as the "Liability Paragraph."[5]

---

final judgment without addressing or resolving Connell's counterclaim. The arguments presented by the parties in the circuit court, the court of appeals, and this court have exclusively addressed whether Connell is liable for the repairs to the apartment. Connell has not requested that we remand the case to the circuit court for resolution of her counterclaims.

[5] Briefs and arguments were presented on behalf of Maryland Arms by Amici Curiae Apartment Association of South Central Wisconsin, Inc., Apartment Association of Southeastern Wisconsin, Inc., Central Wisconsin Apartment Association, and Lakeshore Apartment Association, Inc.

Amici attached a copy of the form lease used by the Apartment Association of South Central Wisconsin. This lease differs from Maryland Arms' form lease. It provides that the

¶ 14. Both parties moved for summary judgment. Maryland Arms cited to nine separate paragraphs in the lease and to one rule, but its brief in support of summary judgment did not analyze the language of the provisions it cited. Rather, it argued that Connell should be liable for the damage to the premises "because it was Cari Connell's hair dryer that caused the fire." Connell asserted that a residential lease that imposed liability for non-negligent acts would be contrary to Wis. Stat. § 704.07 and therefore void.[6] Additionally, Connell argued that the terms of the lease did not impose liability for non-negligent acts.

---

tenant agrees "[t]o be responsible for all acts of negligence or breaches of this agreement by Tenant and Tenant's guests and invitees, and to be liable for any resulting property damage or injury." At oral argument, counsel for amici was unaware of any other form lease besides that of Maryland Arms that contains the language at issue in this case.

[6] Wis. Stat. § 704.07 provides, in relevant part:

(1) Application of section. This section applies to . . . all residential tenancies. An agreement to waive the requirements of this section in a residential tenancy is void. . . .

(2) Duty of landlord. . . . (c) If the premises are damaged by fire, . . . not the result of the negligence or intentional act of the landlord, this subsection is inapplicable and either sub. (3) or (4) governs.

(3) Duty of tenant. (a) If the premises are damaged by the negligence or improper use of the premises by the tenant, the tenant must repair the damage and restore the appearance of the premises by redecorating. . . .

(4) Untenantability. If the premises become untenantable because of damage by fire, . . . the tenant may remove if the inconvenience to the tenant by reason of the nature and period of repair, rebuilding or elimination would impose undue hardship on the tenant. If the tenant remains in possession, rent abates to the extent the tenant is deprived of the full normal use of the premises. . . . This subsection is inapplicable if the damage or condition is caused by negligence or improper use by the tenant.

¶ 15. The circuit court acknowledged that "there was no negligence or improper use proved, or stipulated to, in this case." Without explaining its construction of the terms of the lease, the circuit court stated that the second sentence of the Liability Paragraph "memorializes the parties' intent that the defendants would be liable for accidental fire damage."

¶ 16. The circuit court determined that the Liability Paragraph did not contravene Wis. Stat. § 704.07, and thus Connell was "liable for the fire caused by the hair dryer." The court granted Maryland Arms' motion for summary judgment. Judgment was entered in the amount of $9,342.31, including fees and costs.

¶ 17. The court of appeals reversed the decision of the circuit court. It agreed with Connell that "both the lease and Wis. Stat. § 704.07 . . . require that Cari Connell must be negligent in connection with the fire as a precondition to the imposition of liability." *Maryland Arms Ltd. P'ship v. Connell,* 2009 WI App 87, ¶ 3, 320 Wis. 2d 147, 769 N.W.2d 145. The court remarked that "[i]f indeed the lessee is responsible for 'all damage' caused in any way by the lessee, the first sentence of the provision limiting Cari Connell's liability to damage caused by negligent acts or improper use is unnecessary." *Id.,* ¶ 5.

¶ 18. Despite its apparent conclusion that the lease did not impose liability for damage caused by a tenant's non-negligent acts, the court of appeals went on to conclude that the lease provision was void as "an attempt to waive the requirements of Wis. Stat. § 704.07." *Id.,* ¶ 1. It determined that the clear intent of Wis. Stat. § 704.07 "is to have the landlord shoulder the responsibility for fire repairs when there is no tenant negligence or improper use of the premises." Because Cari Connell was not negligent and did not improperly use the pre-

mises, the court of appeals concluded that Connell was not liable for the fire damage. *Id.*, ¶ 14.

¶ 19. Maryland Arms petitioned this court, asking us to review the court of appeals' determination that the lease provision was void as an attempt to contravene the public policy expressed in Wis. Stat. § 704.07. Connell filed a response, contending that review was unnecessary. Further, she asserted that there was "an alternative ground that would support the result in this case." Specifically, she asserted that the circuit court's construction of the lease was unreasonable because "the act of bringing a hair dryer into [the] apartment or plugging in a hair dryer" was not the cause of the fire, as the term "cause" is understood by its plain and ordinary meaning. We accepted review.

## II

██ ██

¶ 20. We review the grant or denial of a summary judgment motion using the same standards and method as are applied by the circuit court. *Pawlowski v. Am. Family Mut. Ins. Co.,* 2009 WI 105, ¶ 15, 322 Wis. 2d 21, 777 N.W.2d 67. A moving party is entitled to summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; Wis. Stat. § 802.08(2).

██

¶ 21. Here, the material facts are undisputed. The question is whether Maryland Arms is entitled to judgment as a matter of law under the terms of the lease.[7] The interpretation and application of a contract to undisputed facts present a question of law, which we

---

[7] Although the parties' arguments in this case have primarily focused on the interpretation of Wis. Stat. § 704.07, the question of the interpretation of the lease is properly before the court.

review independently of the determinations rendered by the circuit court and the court of appeals. *Osborn v. Dennison,* 2009 WI 72, ¶ 33, 318 Wis. 2d 716, 768 N.W.2d 20.

██

¶ 22. The primary goal in contract interpretation is to "give effect to the parties' intent, as expressed in the contractual language." *Seitzinger v. Cmty. Health Network,* 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426. We interpret the language "consistent with what a reasonable person would understand the words to mean under the circumstances." *Id.*

¶ 23. "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms." *Gorton v. Hostak, Henzl & Bichler, S.C.,* 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998). When the contract language is ambiguous, however, "two further rules are applicable: (1) evidence extrinsic to the contract itself may be used to determine the parties' intent and (2) ambiguous contracts are interpreted against the drafter." *Seitzinger,* 270 Wis. 2d 1, ¶ 22.

### III

¶ 24. In interpreting this residential lease, we examine the relevant portion of the agreement to discern the parties' intent. The Liability Paragraph provides:

Throughout the litigation, Connell has continuously asserted that the terms of the lease do not impose liability under these facts. The court of appeals briefly opined that the terms of the lease did not impose liability for non-negligent acts, but then based its holding on the statute. Connell's response to the petition for review asserted that interpretation of the contract was an alternative ground that would support the court of appeals' decision.

■ Lessee shall be responsible for all intentional and negligent acts or breaches of this Lease by Lessee, Lessee's occupants, guests and invitees. [2] Lessee shall be liable for all damage to the premises and appliances and equipment belonging thereto, in any way caused by the acts of Lessee, Lessee's occupants, guests and invitees.

¶ 25. Initially, we focus on the second sentence of the Liability Paragraph because Maryland Arms asserts that this sentence unambiguously imposes liability on the tenant for the fire damage here. We then turn our focus to the Liability Paragraph as a whole to determine whether the two sentences, when read together, unambiguously demonstrate that the parties intended for the tenant to be liable under these circumstances.

A

■■

¶ 26. Our interpretation of the second sentence centers on the following words: "Lessee shall be liable for all damage to the premises . . . in any way caused by the acts of Lessee[.]" We begin by interpreting the phrase "in any way caused by the acts of Lessee."

¶ 27. Both the circuit court and Maryland Arms contend that the express terms of the second sentence impose absolute liability under these facts. The circuit court examined the second sentence of the Liability Paragraph in isolation and determined that it "memorializes the parties' intent that the defendants would be liable for accidental fire damage"—even though the Liability Paragraph does not discuss "accidental fire damage."

¶ 28. Maryland Arms is more circumspect. It explains that it took Connell's "acts" of bringing the hair dryer into the apartment and plugging it in to "cause"

312

the fire within the meaning of the lease. Maryland Arms asserts that the tenant is contractually liable for damages caused by any act of the tenant[8] if the damage is the result of something "in the control" of the tenant.

¶ 29. At oral argument, counsel for Maryland Arms advanced the argument that under the terms of the lease, the tenant is absolutely liable for anything in her control:

> COURT: The contract makes the tenant absolutely liable?

> MARYLAND ARMS: Under the circumstances that are in the control of the tenant, yes, that is my conclusion. . . .

> COURT: Would you be making the same argument if she did not have it plugged in, but of course she is the one that brought it in, and some way it was next to something that caused some other problem?

> MARYLAND ARMS: If it was the result of something out of the control of the landlord, my answer would be yes. . . .

¶ 30. Subsequently in oral argument, Maryland Arms again emphasized that the meaning of the second sentence centers around the concept of "control":

> This case in my opinion boils down to one concept— who is in control of the item that caused the problem. . . . Obviously, if it is a defective toilet it is the landlord's toilet, the tenant [] is not in control of that. How else is a landlord going to through his contract

---

[8] The lease also addresses acts of the tenant's occupants, guests, and invitees which cause damage. Because occupants, guests, and invitees are not at issue in this case, we do not discuss them further.

protect himself . . . from items or appliances that are brought into the landlord's premises by a tenant?

¶ 31. Additionally, Maryland Arms made clear the breadth of a tenant's liability under its interpretation of the second sentence. According to Maryland Arms, the second sentence covers the "act" of introducing any item or appliance into the apartment: "[B]ut for the act of this tenant to introduce into this unit the hair dryer that caused the fire, we would not be here." The problem with Maryland Arms' interpretation of the second sentence is twofold.

¶ 32. First, it is important to note that not only does the word "control" not appear in the second sentence of the Liability Paragraph, this concept of "control" appears nowhere in the entire lease. The second sentence simply does not distinguish between damage to those items that are within the control of the tenant and those that are not within the tenant's control. In essence, Maryland Arms asks us to read the word "control" into the second sentence. At the same time that Maryland Arms asserts that we should read in the word "control," it contends that the express words of the second sentence unambiguously demonstrate that the parties intended that whoever controlled the item is liable for the damages. Its arguments are at odds with each other.

¶ 33. Second, taken at face value, the breadth of Maryland Arms' construction of the contract would produce absurd results. Maryland Arms asserts that any act within the control of the tenant can give rise to liability under the contract. If the landlord can identify an "act" of the tenant that is a "cause" of the damage to the premises, liability for repairing the premises is shifted to the tenant—regardless of how remote the tenant's act was from the damage and regardless of whether the

314

damage would not have occurred but for other concurrent causes outside of the tenant's control.

¶ 34. Imagine the following scenario: A tenant leaves town for the weekend, locking her apartment. While she is out of town, burglars break into the apartment to steal her possessions. Because the door is locked, they break a window to gain entry. Under the second sentence as construed by Maryland Arms, the tenant would be liable for the damage to the window. The act of locking the door was within her control, and but for this act, the window would not have been broken. Does the language of the second sentence of the Liability Paragraph unambiguously demonstrate the parties' intent that the tenant should be liable for this damage?

¶ 35. Likewise, consider a scenario where lightning strikes an appliance that the tenant brought into the apartment, and the subsequent fire causes substantial damage to the entire apartment complex. Bringing the appliance into the apartment was a cause in fact of the fire. Was it the intent of the parties that the tenant would be liable for such damage when they signed the lease?

¶ 36. An inspection of many apartments would likely reveal that the tenant has brought untold number of items into the apartment and has left many appliances turned off but still plugged into an electrical outlet. Many electrical appliances still have live wires even when turned off. In order to avoid liability, did the parties intend that the tenant should routinely unplug such things as the washer and dryer, microwave, telephone answering machine, dishwasher, alarm clock, stereo, television, DVD player, lamps, computer, modem, and electric toothbrush—as well as the hair dryer?

¶ 37. Here, the second sentence of the Liability Paragraph requires an "act" of the tenant which

315

"causes" damage. We cannot conclude, however, that the acts described above were the kinds of "acts" which the parties intended would render a tenant liable under the express words of that sentence.[9]

¶ 38. Accordingly, we do not agree with the circuit court that the second sentence of the liability paragraph unambiguously "memorializes the parties' intent that the defendant would be liable for accidental fire damage." Because the essential principle posed by Maryland Arms, "control," does not appear in the sentence in question and because it is unclear that the parties intended that the conduct here would constitute an "act" which would impose liability on the tenant, we determine that the sentence in the residential lease is ambiguous.[10]

---

[9] The dissent dismisses the above hypotheticals as inapt. Without pointing to any provision in the lease that references "an act of God" or "control," the dissent concludes: "When damage is caused by an unconnected third party or an act of God, the landlord is assigned the duty to fix and pay for the damage to the premises . . . . In these situations neither party controls events, and responsibility for damage is allocated." Dissent, ¶ 104.

In fact, Maryland Arms' expansive interpretation of the lease would assign the tenant liability for repairing the premises— even when the damage was caused in substantial part by an "unconnected third party" or an "act of God"—as long as the landlord could identify some act of the tenant that was part of a "causal chain." *See id.,* ¶ 112. Appliances, even those that are plugged in, normally do not spontaneously combust without some intervening cause—perhaps a defect caused by the manufacturer or faulty wiring. Here, the factual record is not developed, and nothing in the record sheds light on why this particular hair dryer ignited.

[10] Although the dissent purports to rely on the terms of the lease in concluding that Connell is liable for the accidental fire damage here, it is apparent that the dissent's conclusion is unhinged from the lease. Instead of interpreting the text of the

316

## B

¶ 39. Even if we determined that the second sentence unambiguously imposed absolute liability on the tenant when read in isolation and that such a construction was reasonable, however, we would be forced to pause when examining the Liability Paragraph as a whole. As the court of appeals has explained when interpreting an insurance policy, "A provision that is unambiguous in itself may be ambiguous in the context of the entire policy." *Ruenger v. Soodsma,* 2005 WI App 79, ¶ 10, 281 Wis. 2d 228, 695 N.W.2d 840.

¶ 40. "Contextual ambiguity exists when a provision is reasonably susceptible to more than one construction when read in the context of the policy's other language." *Marotz v. Hallman,* 2007 WI 89, ¶ 39, 302 Wis. 2d 428, 734 N.W.2d 411. "[T]he point of contextual ambiguity [analysis] is not to read provisions in isolation." *Id.* at ¶ 43.[11]

---

lease, the dissent is based on what it considers to be good public policy.

Like Maryland Arms, the dissent poses that the concept of "control"—not found in the lease—"is at the heart of a lease that allocates liability to the party best able to control risk." Dissent, ¶ 103. The dissent asserts that "the tenant is in the best position to manage the premises in a way that minimizes risk." *Id.*

The question addressed in this opinion is not what risk allocation arrangement is most supported by public policy. Rather, the question is whether the terms of this particular lease unambiguously impose liability on the tenant for repairing the property damage at issue here.

[11] "For inconsistencies to alter the construction of an otherwise unambiguous provision, the inconsistencies must be material to the issue in dispute and be of such a nature that a

¶ 41. Here, if the second sentence is read as broadly as Maryland Arms asserts, then the first sentence has no independent meaning. The first sentence provides that the tenant is "responsible" for "intentional and negligent acts or breaches of this lease" by the tenant or her guests. The second sentence provides that the tenant is "liable for all damage . . . in any way, caused by the acts of" the tenant or her guests.

¶ 42. Intentional acts, negligent acts, and breaches are subsets of the broader category "any acts." If the second sentence covered any and all "acts," then it would necessarily cover the types of acts described in the first sentence. Construing the second sentence as broadly as Maryland Arms asserts would subsume the meaning of the first sentence, rendering it mere surplusage.[12]

¶ 43. Given the risk of surplusage, we conclude that the language of the second sentence, when read in the context of the policy's other language, is reasonably susceptible to another construction measured by the objective understanding of an ordinary tenant. Thus, the terms of the lease do not unambiguously provide that Connell is liable for the fire damage caused in part

reasonable insured would find an alternative meaning." *Marotz v. Hallman,* 2007 WI 89, ¶ 39, 302 Wis. 2d 428, 734 N.W.2d 411.

[12] At oral argument, counsel for the amici appeared to agree that Maryland Arms' interpretation would render the first sentence surplusage. Counsel asserted that the second sentence was clear and that " 'in any way caused by' means 'in any way caused by.' " The court asked counsel: "But why do you need the first sentence if you interpret the second sentence to mean the tenant is absolutely liable, which is really what you're saying, for any damage caused by the tenant's act—regardless of negligence or intentional?" Counsel responded: "Exactly . . . , I don't think you need the first sentence. I think to hold the tenant liable here you only need the second sentence."

by her acts of bringing a hair dryer into the apartment and plugging it in to an electrical outlet.[13]

## C

¶ 44. Having determined that there is ambiguity whether the second sentence of the lease is read in isolation or in conjunction with the first sentence, we must construe the words to determine the meaning. The principle that ambiguities are construed against the drafter is a "deeply rooted doctrine" of contract interpretation. *Walters v. Nat'l Props., LLC,* 2005 WI 87, ¶ 13, 282 Wis. 2d 176, 699 N.W.2d 71. "In choosing among the reasonable meanings of [an agreement], that

[13] In its brief to the court, Maryland Arms highlights seven additional provisions in the residential lease and one rule contained in an appendix to the lease agreement. Without providing any analysis, it asserts that "while the majority of the appellate proceedings focused on [the Liability Paragraph], this Court can find the Connells liable for the property damage pursuant to" each of the highlighted provisions. Generally, we do not respond to issues that have not been fully developed or briefed. *State v. Johnson,* 2009 WI 57, ¶ 71, 318 Wis. 2d 21, 767 N.W.2d 207.

Nevertheless, it appears that most of the provisions highlighted by Maryland Arms are inapt. For instance, paragraph 3.3 provides that the landlord "shall not be liable to Lessee or others . . . for any damage to or loss of any personal property located in or about the premises[.]" Similarly, paragraph 8.1(d) provides that the landlord "shall not be liable for any loss . . . which Lessee may sustain." Maryland Arms' liability to Connell is not at issue in this case. The only provision which might be relevant is paragraph 3.2, use restrictions. It provides: "Lessee shall not use or keep in or about the premises any article or thing which would in any manner increase the risk of fire . . . ." Maryland Arms has not presented any analysis or argument about how that provision applies to these facts.

meaning is generally preferred which operates against the party who supplies the words[.]" Restatement (Second) of Contracts § 206 (1979).[14]

¶ 45. When possible, contract language should be construed to give meaning to every word, "avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage." *Kasten v. Doral Dental USA, LLC,* 2007 WI 76, ¶ 48, 301 Wis. 2d 598, 733 N.W.2d 300. Connell asserts that the only way to read the Liability Paragraph and give meaning to both sentences is to construe "any acts" in the second sentence to refer to the types of acts enumerated in the first sentence.

¶ 46. Connell offers an alternative to Maryland Arms' assertion that the Liability Paragraph imposes absolute liability. She explains that the first sentence assigns "responsibility" to the tenant for "intentional or negligent acts [and] breaches of this lease." Under the first sentence, the tenant is "responsible" regardless of whether the act or breach of the lease is the act of the tenant or of the tenant's "occupant, guest, or invitee." The second sentence describes what the tenant is liable

---

[14] The comments to the Restatement explain the rationale underlying this rule:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties in meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert.

Restatement (Second) of Contracts § 206 (1979) cmt. a. Further, "[t]his rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position." *Id.*; *see also Gorton v. Hostak, Henzl & Bichler, S.C.,* 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998).

for if she breaches the duties described in the first sentence—the tenant is liable for the damage caused to "the premises and appliances and equipment belonging thereto."

¶ 47. Because Connell's interpretation construes the ambiguity against the drafter and avoids a construction that would render the first sentence meaningless surplusage, we conclude that she offers the more reasonable interpretation of the Liability Paragraph. Therefore, we read the "acts" discussed in the second sentence to refer to the acts that the lease provides responsibility for in the first sentence—intentional or negligent acts or breaches of the lease. Such a construction of the lease comports with another principle of contract interpretation—it avoids a construction that produces an absurd result.

 

¶ 48. Given that our construction of the lease is dispositive, we decline to address whether any lease provision that assigned liability to a tenant for damages not caused by negligent acts or misuse would contravene the public policy set forth in Wis. Stat. § 704.07.[15] Typically, an appellate court should decide cases on the narrowest possible grounds. *State v. Blalock,* 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989). Issues that are not dispositive need not be addressed. *Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938).

¶ 49. In sum, because the essential principle posed by Maryland Arms, "control," does not appear in the sentence in question and because it is unclear that

[15] The amici expressed concerns that the court of appeals' ruling impedes the freedom to contract. Because our conclusion is based solely on an interpretation of this lease, the freedom to contract is not implicated by this decision. We save for another day a discussion of the scope of Wis. Stat. § 704.07.

the parties intended that the conduct here would constitute an "act" that would impose liability on the tenant, we determine that the sentence in the residential lease is ambiguous. Further, the ambiguity is compounded when that sentence is read in the context of the paragraph as a whole, because Maryland Arms' construction of that sentence would render the preceding sentence surplusage. Thus, we conclude that the terms of the lease do not unambiguously provide that Connell is liable for the fire damage caused in part by her acts of bringing a hair dryer into the apartment and plugging it in to an electrical outlet.

¶ 50. Accordingly, we affirm the decision of the court of appeals, albeit on a different rationale.

*By the Court.*—The analysis of the court of appeals is modified, and, as modified, affirmed.

¶ 51. ANNETTE KINGSLAND ZIEGLER, J. (*concurring*). I join the majority opinion and agree that the lease at issue does not unambiguously provide that the tenant, Cari Connell (Connell), is liable for the fire damage caused by her hair dryer, *see* majority op., ¶ 43, especially since the parties stipulated that neither Connell nor Maryland Arms Limited Partnership (Maryland Arms) was negligent. Therefore, the lease must be construed against the drafter and in favor of the tenant. *See Walters v. Nat'l Props.*, 2005 WI 87, ¶ 13, 282 Wis. 2d 176, 699 N.W.2d 71 (providing that this court adheres to the "universally accepted legal maxim that any ambiguities in a document are to be construed unfavorably to the drafter"); *see also Fergen v. Lyons*, 162 Wis. 131, 135, 155 N.W. 935 (1916) ("[I]n case of any ambiguity in the provision of a lease . . . , the construction should be adopted which will favor the tenant rather than one which will favor the landlord."). In this

case, the lease does not unambiguously allocate liability to the tenant for fire damage caused by her hair dryer—that is, fire damage caused by neither the landlord's "negligence or intentional act," Wis. Stat. § 704.07(2)(c), nor the tenant's "negligence or improper use" of the apartment, § 704.07(3)(a). The benefit of the ambiguity must therefore fall in the tenant's favor. I write separately, however, to clarify that parties are not necessarily prohibited from allocating liability by contract, *see* dissent, ¶ 122, so long as it is done clearly and is otherwise enforceable by law.

¶ 52. Wisconsin Stat. § 704.07 outlines the general duties of a landlord and tenant with respect to repairing leased premises. To determine the parties' duties, it is instructive to go through each subsection of § 704.07. A review of each subsection makes clear that § 704.07 does not dictate who is liable for repair when the premises are damaged by fire caused by neither the landlord's "negligence or intentional act" nor the tenant's "negligence or improper use."

¶ 53. As a preliminary matter, subsection (1) provides that Wis. Stat. § 704.07 applies "to all residential tenancies" and that "[a]n agreement to waive the requirements of this section in a residential tenancy is void." § 704.07(1).

¶ 54. Pursuant to subsection (2), the landlord has the duty to "[m]ake all necessary structural repairs" "[e]xcept for repairs made necessary by the negligence of, or improper use of the premises by, the tenant." Wis. Stat. § 704.07(2)(a)3. Accordingly, under § 704.07(2), the landlord has the primary duty to repair unless the repairs are made necessary by the tenant's negligence or improper use of the premises. However, significant to this case, subsection (2) does not apply "[i]f the premises are damaged by fire, water or other casualty, not the

result of the negligence or intentional act of the landlord." § 704.07(2)(c). Instead, "either sub. (3) or (4) governs." *Id.* Hence, it seems that if the landlord's negligence or intentional act caused the "fire, water or other casualty" damage, then the duty to repair remains with the landlord, as provided in subsection (2). However, if the "fire, water or other casualty" damage is caused by something other than the landlord's negligence or intentional act, then we must turn to subsection (3) or (4).

¶ 55. In this case, Connell's apartment was damaged by fire. The parties stipulated that Connell's "hair dryer was the cause of the fire" and that "Connell did not previously know of any defect in said hair dryer." Accordingly, the parties stipulated that the fire was caused by something other than the negligence or intentional act of the landlord or the negligence or improper use of the premises by the tenant.

¶ 56. As I turn to subsection (3), it outlines the tenant's duty to repair the damage and restore the appearance of the premises "[i]f the premises are damaged by the negligence or improper use of the premises by the tenant." Wis. Stat. § 704.07(3)(a). In such instances the landlord "may elect to undertake the repair," but "the tenant must reimburse the landlord for the reasonable cost thereof." *Id.*

¶ 57. Given the parties' stipulation that the fire damage was caused by Connell's hair dryer, as opposed to Connell's negligence or improper use of the apartment, the tenant's duty to repair under subsection (3) does not govern the facts of this case, and we must then turn to subsection (4).

¶ 58. Subsection (4) provides the tenant with certain options and rights "[i]f the premises become untenantable because of damage by fire, water or other casualty":

1. "[T]he tenant may remove from the premises unless the landlord proceeds promptly to repair or rebuild";

2. The tenant may remove if the inconvenience by reason of the nature and period of repair or rebuilding "would impose undue hardship on the tenant";

3. The tenant may remain in possession of the premises, provided that "rent abates to the extent the tenant is deprived of the full normal use of the premises"; and

4. If the tenant justifiably moves out under subsection (4), "the tenant is not liable for rent after the premises become untenantable and the landlord must repay any rent paid in advance apportioned to the period after the premises become untenantable."

Wis. Stat. § 704.07(4). These options and rights do not seemingly apply if the damage is caused by the tenant's negligence or improper use. *Id.*

¶ 59. As the dissent points out, in this case, neither the pleadings nor the parties' stipulation of facts expressly indicates whether Connell's apartment became untenantable because of the fire damage. Dissent, ¶ 127. However, at oral argument, counsel for Maryland Arms appeared to concede that the apartment was untenantable:

> Attorney Wynn: [Connell] went to bed at night, left her hair dryer plugged in, presumably off. When she woke up, the apartment was on fire and caused over $8000 of damages. Fortunately no one was personally injured; however, the apartment was destroyed.
>
> Court: If the apartment was destroyed, I assume that it was uninhabitable. Is that correct?
>
> Attorney Wynn: Yes. And in fact, in this particular circumstance . . . the tenant was relocated to another apartment owned also by Maryland Arms.

Maryland Arms subsequently repaired the damaged apartment and billed Connell for the cost, minus her $200 security deposit, for a total of $8,533.81. According to Connell, Maryland Arms terminated her tenancy when she refused to pay.

¶ 60. Assuming that the fire damage did in fact render Connell's apartment untenantable, Connell was well within her rights to remove from the premises while Maryland Arms repaired. *See* Wis. Stat. § 704.07(4). However, subsection (4) is silent as to who is responsible for the costs of repair. Invoking paragraph 3.6 of its lease,[1] Maryland Arms demanded that Connell reimburse it for the repair costs.

¶ 61. However, the parties' freedom to contract is subject to our "universally accepted legal maxim that any ambiguities in a document are to be construed unfavorably to the drafter." *See Walters,* 282 Wis. 2d 176, ¶ 13; *see also Fergen,* 162 Wis. at 135. In my view, the lease at issue does not unambiguously allocate liability to Connell for the fire damage caused by her hair dryer and must therefore be construed in her favor.

¶ 62. According to Maryland Arms, the second sentence of paragraph 3.6 of the lease unambiguously imposes absolute liability on the tenant for all damage "in any way" caused by the tenant's "acts," be they negligent or otherwise. Maryland Arms argues that Connell is therefore liable for the fire damage because Connell brought the hair dryer into the apartment. I do not agree with Maryland Arms' and the dissent's posi-

---

[1] Paragraph 3.6 provides:

Lessee shall be responsible for all intentional and negligent acts or breaches of this Lease by Lessee, Lessee's occupants, guests and invitees. Lessee shall be liable for all damage to the premises and appliances and equipment belonging thereto, in any way caused by the acts of Lessee, Lessee's occupants, guests and invitees.

tion that the lease unambiguously allocates liability to the tenant for any damage caused by anything the tenant brings into her apartment. *See* dissent, ¶¶ 74–76.

¶ 63. The ambiguity is further shown by the fact that were we to accept Maryland Arms' interpretation of the second sentence of paragraph 3.6, the first sentence would be rendered meaningless. *See* majority op., ¶ 41. The first sentence imposes responsibility onto the tenant for all the tenant's "intentional and negligent acts or breaches." The tenant's "intentional and negligent acts" are necessarily encompassed in the second sentence's category of the tenant's "acts." Thus, "[c]onstruing the second sentence as broadly as Maryland Arms asserts would subsume the meaning of the first sentence." Majority op., ¶ 42. We must avoid a construction of the lease which renders portions of the " 'meaningless, inexplicable or mere surplusage.' " *Kasten v. Doral Dental USA, LLC,* 2007 WI 76, ¶ 48, 301 Wis. 2d 598, 733 N.W.2d 300 (quoting *Goebel v. First Fed. Sav. & Loan Ass'n of Racine,* 83 Wis. 2d 668, 680, 266 N.W.2d 352 (1978)); *see also Baker v. McDel Corp.,* 53 Wis. 2d 71, 76–77, 191 N.W.2d 846 (1971).

¶ 64. Because the lease does not unambiguously allocate liability to Connell for fire damage caused by the mere fact that she brought a hair dryer into her apartment, we must construe the lease in her favor. For that reason, I respectfully concur.

¶ 65. DAVID T. PROSSER, J. (*dissenting*). This dispute requires us to interpret an apartment lease and to square its terms with Wis. Stat. § 704.07, which sets out certain rights and duties of landlords and tenants.

### THE LEASE

¶ 66. In November 2005, Cari Connell, 21, rented an apartment in a 41–unit building in Milwaukee. She

327

signed a 9–page lease. The lease was co-signed by Cari's mother, Linda, who personally guaranteed payment of any and all sums due to the lessor under the lease. The lease was renewed for a second year in 2006.

¶ 67. The lease contains numerous provisions pertaining to such matters as rent, the security deposit, the obligations of the lessee (tenant), and the rights of the lessor (landlord). Among these provisions are the following:

2.3 Said premises shall be left by Lessee in a clean and undamaged condition. The cost or estimate of repairing any damage to said premises which is not listed in the Apartment Inspection Report shall be deducted from the security deposit, as will the cost of restoring the premises to a clean and rentable condition, *normal wear and tear excepted.*

. . . .

3.3 *Lessor not liable for property damage or loss.* Lessee expressly agrees that Lessor shall not be liable to Lessee or others, including Lessee's guests, occupants and invitees, for any damage to or loss of any personal property located in or about the premises, or the building of which the premises are a part, where said damage or loss results from any cause whatsoever, *other than the negligent acts of Lessor.* It is the responsibility of the Lessee to provide insurance for their personal property.

. . . .

3.5 *Lessee to keep premises clean and in good repair.* Lessee shall keep the premises in a clean, tenantable condition and in as good repair as at the beginning of the Lease term, *normal wear and tear excepted.*

3.6 *Lessee responsible for acts and breaches of Lease by Lessee and Lessee's occupants, guests and invitees.* Lessee shall be responsible for all intentional and

negligent acts or breaches of this Lease by Lessee, Lessee's occupants, guests and invitees. Lessee shall be liable for all damage to the premises and appliances and equipment belonging thereto, in any way caused by the acts of Lessee, Lessee's occupants, guests and invitees.

. . . .

6. *DAMAGE OR DESTRUCTION BY FIRE OR OTHER CASUALTY.* Subject to Wisconsin Law, in the event that the Leased premises suffers casualty loss or damage as a result of fire or other casualty, and in the event that, as a result of said loss or damage, the Leased premises are rendered uninhabitable, and in the event the premises may be restored or the damages repaired, this Lease and the liability for rent shall continue, except that said liability for rent shall be abated during any period of repair or reconstruction. In the event the premises cannot be repaired within sixty (60) days from the happening of such injury, then this Lease shall cease and terminate from the date of such injury. Said liability for rent shall not abate if the loss, damages or injury to the demised premises is caused by the negligence of Lessee, Lessee's occupants, guests or invitees.

(Emphasis added.)

¶ 68. The purpose of several of the lease provisions is to limit the liability of one of the parties. The lease also allocates liability for a casualty like fire or other damage to the premises in situations where neither party is at fault. For instance, the lessee is made responsible for intentional and negligent acts or breaches of the lease by the lessee's occupants, guests and invitees, even though the lessee personally may be wholly without fault. Section 3.6.

## INTERPRETING THE LEASE

¶ 69. This case involves an accidental fire in Cari's apartment in 2007 that caused more than $8,500 in

damage to the premises. The first issue is whether the lease assigns liability for this damage to the tenant under circumstances in which the fire was caused by a hair dryer owned by the tenant, after the tenant brought the hair dryer into the apartment, plugged it in, and left it plugged in overnight.

¶ 70. The critical lease provision, Section 3.6, reads as follows:

> Lessee shall be responsible for all intentional and negligent acts or breaches of this Lease by Lessee, Lessee's occupants, guests and invitees. *Lessee shall be liable for all damage to the premises* and appliances and equipment belonging thereto, *in any way caused by the acts of Lessee,* Lessee's occupants, guests and invitees. (Emphasis added.)

¶ 71. The landlord does not claim that the tenant was negligent or that the tenant intentionally breached any provision of the lease. The landlord does claim, however, that the tenant caused the damage. The landlord claims that the tenant "caused" the damage by acts which, though in themselves innocent, were nonetheless intentional and led to the fire in Cari's bathroom.

¶ 72. The word "cause" has a well-established meaning in Wisconsin law. When determining whether an act "caused" an injury or harm as a factual matter, the test is whether the act was a "substantial factor" in causing the injury or harm. *Richards v. Badger Mut. Ins. Co.,* 2008 WI 52, ¶ 47, 309 Wis. 2d 541, 749 N.W.2d 581 ("One is causally negligent when his or her conduct is a substantial factor in causing injury to another."); *see* Wis. JI—Civil 1500.

¶ 73. Causation is one of the fundamental elements in a negligence claim. Cause questions ask

whether there was a causal connection between the negligence of any person and the injury claimed. The questions do not ask about "*the* cause" but rather "*a* cause." Ultimately, the fact-finder must determine whether a party's negligence was a *substantial factor* in producing the injury. Wis. JI—Civil 1500.

¶ 74. Here, the landlord is *not* required to establish negligence. The landlord is not required even to allege negligence because the lease makes the tenant liable for damage to the premises "*in any way* caused by the acts of the Lessee." (Emphasis added.) The focus, then, is on the causal connection between acts of the tenant and damage to the premises. Were the acts of the tenant substantial factors in producing the damage to the premises? Specifically, were Cari's acts in plugging in her hair dryer and leaving it plugged in overnight, or longer, substantial factors in causing the fire? The circuit court found that "the defendants [were] liable for the fire caused by the hair dryer."

¶ 75. Employing the "substantial factor" test to determine whether Cari's acts produced the fire is a rational and reasonable way to interpret the word "cause" in the lease and to determine liability. *See Clark v. Leisure Vehicles,* 96 Wis. 2d 607, 617–18, 292 N.W.2d 630 (1980).

¶ 76. Using that test, the lease provision at issue unambiguously renders the tenant liable for the fire damage caused by her acts of bringing her hair dryer into the apartment, plugging in the hair dryer, and leaving the hair dryer plugged in for hours when it was not being used.

## THE LANDLORD'S INTEREST

¶ 77. Residential appliance fires cause an estimated 25 deaths, 525 injuries, and $211 million in

property damage each year. *See* United States Fire Administration, Focus on Fire Safety: Appliance Fires, *available at* http://www.usfa.dhs.gov/citizens/focus/appliances.shtm. The appliances involved include everything from television sets to hair dryers. USFA Fire Cause Methodology, *available at* http://www.usfa.dhs.gov/fireservice/nfirs/tools/fire_cause_category_matrix.shtm. According to the National Fire Protection Association, fire from electrical equipment, like hair dryers, was the third leading cause of house fires in 1998. Ken Amaro, *Hair Dryer May Be Too Hot to Handle,* First Coast News (May 6, 2004), *available at* http://www.firstcoastnews.com/news/news-article.aspx?storyid=18342.

¶ 78. Residential appliance fires are only one of many financial risks facing property owners, including landlords. Some of these risks are unavoidable. Prudent property owners acquire insurance to cover these risks, but the more risks they seek to cover, irrespective of fault and irrespective of their ability to control the risks, the higher the premiums the insureds are likely to pay. Thus, landlords have a strong economic incentive to allocate liability to tenants in situations where tenants are better able to control risk or where tenants are actually at fault.

¶ 79. When landlords allocate some risk of liability to tenants, their objectives would be undermined if they got tripped up in problems of proof.

¶ 80. Section 2.3 of the lease is a classic example of risk allocation:

> 2.3 Said premises shall be left by Lessee in a clean and undamaged condition. The cost or estimate of repairing any damage to said premises which is not

listed in the Apartment Inspection Report shall be deducted from the security deposit, as will the cost of restoring the premises to a clean and rentable condition, normal wear and tear excepted.

Section 2.3 does not require the landlord to *prove* that the tenant caused the damage found in the tenant's apartment.

¶ 81. Section 3.6 does require proof of causation, but it does not require proof of negligence.

¶ 82. As noted above, the landlord did not allege negligence. The lease was drafted so that the landlord would not be required to prove negligence, inasmuch as proof of negligence—as opposed to proof of cause—could be both costly and difficult. It does not follow, however, that there was no fault in Cari's actions simply because the landlord did not allege negligence.

¶ 83. Since at least the late 1970s, Underwriters Laboratories, Inc. has required all electronic personal grooming appliances, e.g., hair dryers, bearing the UL seal, to attach tags to the power supply cord warning users to unplug the appliance after using.[1] *See* Underwriters Laboratories, Inc., *Standard for Safety: Electric Personal Grooming Appliances* 38 (5th ed., Apr. 9, 1979)

---

[1] The UL standards state:

An appliance of the type described in paragraph 37.6 [[a] hand supported hair dryer blower styler, styler dryer, heated air comb, etc.] shall be provided with a tag that is permanently attached to the power supply cord. The following warning instruction shall be included on the tag:

DANGER—TO REDUCE THE RISK OF ELECTROCUTION:

1. Always unplug this appliance after using.

. . . .

DO NOT REMOVE THIS TAG.

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(UL 859). Warnings are also included in the instructional materials accompanying the product:

> WARNING—To reduce the risk of burns, electrocution, fire, or injury to persons:
>
> 1. An appliance should never be left unattended when plugged in.

*Id.*

¶ 84. The reason for this warning is that parts in many hair dryers are electrically live even when the switch is off.[2]

¶ 85. Against this background, requiring a landlord to prove a tenant's negligence before allocating liability for an appliance fire would require the landlord to investigate the circumstances surrounding a tenant's use of the appliance before the fire: What brand of appliance was involved? Was a warning label attached to the appliance? Had the appliance been dropped or a cord damaged before use? Was the appliance turned on or plugged in before the fire? Was an appliance that was turned on left unattended? How long was an appliance left plugged in? Most of this information would have to be obtained from the tenant.

¶ 86. In this case, the landlord did not attempt to determine the brand of hair dryer, whether it had a warning label, or how long it had been plugged in

---

Underwriters Laboratories, Inc., *Standard for Safety: Electric Personal Grooming Appliances* 36A (5th ed., Apr. 9, 1979) (UL 859).

[2] Several current brands of hair dryers (Conair, Revlon, Vidal Sassoon) attach warning labels that read: "UNPLUG IT[.] As with most electrical appliances parts in this dryer are electrically live even when switch is off: To Reduce Risk of Death by Electric Shock: 1. Always 'Unplug It' After Use."

because the landlord did not have to prove negligence. Instead, the landlord established that Cari left her hair dryer plugged in—at least overnight—and that the hair dryer caused the fire. Leaving the hair dryer plugged in was a substantial factor in causing the fire, and this evidence satisfied the landlord's burden under the lease.

## MAJORITY OPINION

¶ 87. The majority does not like this result because it believes the tenant, who knowingly accepted liability for damage caused by her acts, is not as able to bear the cost of that damage as the landlord. The majority engages in fanciful argument to divert attention from the plain language of the lease. It concludes that the language of the lease is ambiguous, and, therefore, the lease must be construed against the drafter.

¶ 88. The central provision of the lease reads:

3.6 Lessee responsible for acts and breaches of Lease by Lessee and Lessee's occupants, guests and invitees. [1] Lessee shall be responsible for all intentional and negligent acts or breaches of this Lease by Lessee, Lessee's occupants, guests and invitees. [2] Lessee shall be liable for all damage to the premises and appliances and equipment belonging thereto, in any way caused by the acts of Lessee, Lessee's occupants, guests and invitees.

¶ 89. The majority argues that the second sentence is ambiguous and that the ambiguity "is compounded when that sentence is read in the context of the paragraph [Section 3.6] as a whole, because Maryland Arms' construction of that sentence would render the preceding sentence surplusage." Majority op., ¶ 3. The majority writes:

335

> [I]f the second sentence is read as broadly as Maryland Arms asserts, then the first sentence has no independent meaning. . . .
>
> Intentional acts, negligent acts, and breaches are subsets of the broader category "any acts." If the second sentence covered any and all "acts," then it would necessarily cover the types of acts described in the first sentence. Construing the second sentence as broadly as Maryland Arms asserts would subsume the meaning of the first sentence, rendering it mere surplusage.

Majority op., ¶¶ 41–42.

¶ 90. This interpretation is not correct. The first sentence reads: "Lessee shall be responsible for all intentional and negligent acts or breaches of this Lease by Lessee and Lessee's occupants, guests and invitees." This sentence may be deconstructed as follows:

A. Lessee shall be responsible for all intentional acts.

B. Lessee shall be responsible for all negligent acts.

C. Lessee shall be responsible for all breaches of the lease.

D. Lessee also is responsible when one of these acts or breaches is done by Lessee's occupants, guests or invitees.

¶ 91. The first sentence makes the tenant "responsible" for the tenant's intentional or negligent acts or the tenant's "breaches of this Lease." A tenant's intentional acts, negligent acts, or breaches of the lease may have nothing to do with "*damage to the [tenant's] premises*" or with "liability" therefor, which is the subject of the second sentence.

¶ 92. To illustrate, the lease contains a number of duties and prohibitions for the tenant. For example, the tenant is *prohibited* from keeping any pets on the

336

premises, using the premises for immoral or unlawful purposes, creating noise or disturbances, dropping items from windows, allowing water to run except when in use, allowing the apartment to be used as a place of business, using grills, obstructing sidewalks and entryways, or interfering with heating, lighting, and other building apparatuses. Furthermore, the tenant is *required* to maintain the apartment in a way that will not increase the risk of fire, keep the premises clean and in good repair, remove garbage from the premises, park vehicles in a proper manner, and pay utility bills when due.

¶ 93. The first sentence of Section 3.6 holds the tenant *responsible* for all these requirements, even when they are committed by a person, like a guest, other than the tenant. So long as these acts do not result in *damage to the premises,* however, they do not come within the purview of the second sentence.

¶ 94. To illustrate specifically, Section 3.1 prohibits a lessee from keeping pets on the premises without written permission. When a tenant keeps a pet without permission, the tenant breaches the lease. When that pet bites or scratches a child walking in the hallway of the building, the tenant will be "responsible" for injury, not the landlord. In neither situation is there "damage to the premises."

¶ 95. One can easily imagine situations in which a tenant causes injury to another by a negligent act but does *not* damage the premises. Improper treatment of garbage may not damage the premises or create "liability," but it may drive other tenants crazy.

¶ 96. Scrutinizing what is covered in the first sentence of Section 3.6 makes the scope of the second sentence clear. The second sentence introduces an element not necessarily present in the first sentence;

337

namely, "damage to the premises"—and it omits prerequisite conditions present in the first sentence; namely, intent, negligence, or breach of the lease. Because the second sentence does not require a breach of the lease as a prerequisite for liability, it reaches acts that would not be objectionable if they had not resulted in "damage to the premises," e.g., leaving a hair dryer plugged in when not in use.

¶ 97. Conversely, the second sentence does not reach a broad swath of activity for which the tenant might be "responsible" but would not be "liable" on account of "damage to the premises." The second sentence allocates liability to the tenant for *damage to the premises,* irrespective of whether the tenant's causative acts involved intent, negligence, or breach of the lease.

¶ 98. For the majority to insist that Maryland Arms' construction of the second sentence renders the first sentence surplusage disregards the different terms and different scope of the two sentences.

¶ 99. The majority adopts the tenant's interpretation of Section 3.6, under which the first sentence assigns "responsibility" for "intentional or negligent acts" and "breaches of this lease," and the second sentence assigns liability caused only by breaches of the duties enumerated in the first sentence. Majority op., ¶ 46.

¶ 100. The majority, in effect, concludes that Section 3.6 intends to say: "Lessee shall be liable for all damage to the premises caused by the tenant's intentional or negligent acts or breaches of this lease," and nothing more. This interpretation erases distinctions and disregards the import of plain language, and, of course, it would force the landlord to prove such elements as negligence.

¶ 101. The sentence "Lessee shall be liable for all damage to the premises . . . in any way caused by the acts of Lessee" could not be more clear.

¶ 102. The majority also attacks counsel's explanation of the lease in terms of "control." "[C]ontrol," the majority declares, does "not appear in the second sentence of the Liability Paragraph." [3.6] Indeed, the "concept of 'control' appears nowhere in the entire lease." Majority op., ¶ 32. What the majority evidently forgets is that the landlord's legal rights are not grounded in the rhetoric or analysis of counsel; they are grounded in the language of the lease.

¶ 103. The truth is, however, that the concept of "control" is at the heart of a lease that allocates liability to the party best able to control risk. When a tenant rents an apartment, the tenant takes custody and control of the premises.[3] The landlord may establish rules and regulations; but in almost all circumstances, the tenant controls who goes into the apartment, what goes into the apartment, and what transpires in the apartment. Under these circumstances, the tenant is in the best position to manage the premises in a way that minimizes risk. When the landlord later discovers damage to the premises, the landlord cannot be expected to prove that the damage was caused by the tenant's negligence as opposed to, say, an invitee's negligence, or whether the damage was simply the result of an accident. For sound policy reasons related to control, liability for damage to the premises is assigned to the tenant if the landlord can show that the damage was caused by an act of the tenant, the tenant's occupants, the

---

[3] Wisconsin Stat. § 704.05(2) notes that, with a few exceptions, "the tenant has the right to exclusive possession of the premises."

tenant's guests, or the tenant's invitees. The tenant is not liable for "normal wear and tear," and the tenant is not liable for damage that is fairly attributable to the landlord.

¶ 104. When damage is caused by an unconnected third party or an act of God, the landlord is assigned the duty to fix and pay for the damage to the premises but the tenant must assume the cost of repairing or replacing her personal property. *See* Section 3.3. In these situations neither party controls events, and responsibility for damage is allocated based upon the ownership of the damaged property.

¶ 105. When the landlord is made responsible for abnormal damage that is actually caused by tenants, the landlord must spread the resulting expense among all tenants by charging higher rent. When a tenant is made liable for damage that is caused by that tenant, the landlord is better able to contain rent and the tenant has an economic incentive for prudent stewardship of the premises. The tenant also is encouraged to buy insurance for her protection as well as the protection of others. *See* Section 3.3. Imposing responsibility on the landlord for damage caused by a tenant, when the landlord cannot control risks created by that tenant, defies economic logic.

¶ 106. The concept of control is linked to the substantial factor test which is central to causation. A tenant would not be liable in circumstances that are not within the tenant's control. The majority's attack on counsel's "control" analysis is unavailing because it fails to address a real issue.

¶ 107. The majority makes a third argument attacking the lease:

> [T]aken at face value, the breadth of Maryland Arms'
> construction of the contract would produce absurd

results. Maryland Arms asserts that any act within the
control of the tenant can give rise to liability under the
contract. If the landlord can identify an "act" of the
tenant that is a "cause" of the damage to the premises,
liability for repairing the premises is shifted to the
tenant—regardless of how remote the tenant's act was
from the damage and regardless of whether the damage
would not have occurred but for other concurrent
causes outside of the tenant's control.

Majority op., ¶ 33.

¶ 108. There are several defects in this descrip-
tion of the landlord's position. Counsel's "control" analy-
sis should be viewed as a limitation on a tenant's
liability, not an attempt to extend it indefinitely. No
rational fact-finder would hold a tenant liable for dam-
age when a burglar breaks a window to gain entry to
the tenant's apartment, or when lightning strikes the
apartment. Majority op., ¶¶ 34–35. These intervening
events are not within the control of the tenant and
damage cannot be attributed to any act of the tenant.

¶ 109. Stated differently, the acts of the tenant in
the majority's hypotheticals would not be substantial
factors in causing the purported damage. The acts
portrayed in the hypotheticals are very different from a
tenant leaving a hair dryer plugged in overnight when
it is not being used. There is no question that Cari's acts
were "substantial factors" in causing the damage. When
a burglar breaks a window to enter an apartment, the
burglar's act is so overwhelmingly the cause of the
damage that it simply could not be said that the
tenant's act of locking the door was a substantial factor.

¶ 110. The majority gives a laundry list of electri-
cal appliances to suggest the scope of the tenant's
potential liability. It then reasons that the parties could
not have intended that the tenant routinely unplug all

341

these appliances. Majority op., ¶ 36. This reasoning ignores the purpose of the provision at issue: to allocate risk to the party that controls the premises and the appliances on that premises.

¶ 111. Is it more logical to hold the landlord responsible for fires caused by the tenant's electrical appliances—even when the landlord may have no knowledge of the appliances, much less the ability to plug them in or unplug them when they are not being used? The simple fact is, if and when a fire occurs, someone will have to pay for it. In the relatively unusual situation here—a fire in the tenant's apartment caused by neither the negligence or intentional act of the landlord nor the negligence or improper use of the premises by the tenant—contractually allocating risk to the tenant is not less reasonable than imposing that risk on the landlord.

¶ 112. Causation is normally a fact question. There may be situations in which it is genuinely unclear whether a tenant's act or acts caused the damage for which the landlord is seeking to hold the tenant liable. The proper response in such a case is not to reinterpret the lease but rather to make a factual finding on the question of cause. *See Fandrey v. Am. Fam. Mut. Ins. Co.,* 2004 WI 62, ¶ 12, 272 Wis. 2d 46, 680 N.W.2d 345 (cause-in-fact is an issue for the jury). The word "cause" is not ambiguous simply because, in different fact situations, it is not easy to determine whether certain acts caused damage. The stipulated facts in this case show a causal chain between the tenant's acts and the fire in her apartment. In short, Cari's acts were a substantial factor in producing the damage.

¶ 113. Finally, the lease does not necessarily "shift" liability to the tenant. A tenant is clearly respon-

sible for loss to her own personal property, from her hair dryer to her clothes to her furniture, from theft or fire, absent the landlord's negligence. The landlord would contend that the lease codifies a tenant's common law responsibility for other damage on these facts.[4]

¶ 114. For all these reasons, I cannot agree with the majority's conclusion that the lease is ambiguous. The lease unambiguously renders the tenant liable for the damage to the premises caused by her acts of plugging in her hair dryer and leaving it plugged in overnight, or longer.

### APPLICATION OF WIS. STAT. § 704.07

¶ 115. The majority declines to address the second issue, whether Wis. Stat. § 704.07 precludes a residential lease from allocating liability for damages that were caused by something other than the negligence or intentional act of the landlord or the negligence or improper use of the premises by the tenant. The court of appeals based its decision on these statutory grounds, not on a fanciful interpretation of the lease.

¶ 116. This case involves the interplay of several different provisions within Wis. Stat. § 704.07. The statute begins by asserting that it applies to all residential tenancies and that "[a]n agreement to waive the requirements of this section in a residential tenancy is void." § 704.07(1). The statute then sets out the duties of the landlord in subsection (2):

> (a) Except for repairs made necessary by the negligence of, or improper use of the premise by, the

---

[4] "At common law the tenant bore the risk of a fire or any other casualty loss." Judicial Council Committee Note, 1969, Wis. Stat. § 704.07 (quoted in *Maryland Arms Limited Partnership v. Connell*, 2009 WI App 87, ¶ 10, 320 Wis. 2d 147, 769 N.W.2d 145).

tenant, the landlord has a duty to do all of the following:

1. Keep in a reasonable state of repair portions of the premises over which the landlord maintains control.

. . . .

3. Make all necessary structural repairs.

. . . .

(c) *If the premises are damaged by fire, water or other casualty, not the result of the negligence or intentional act of the landlord, this subsection is inapplicable and either sub. (3) or (4) governs.*

Wis. Stat. § 704.07(2) (emphasis added).

¶ 117. The statute sets out the duties of the tenant in subsection (3):

(a) If the premises are damaged by the negligence or improper use of the premises by the tenant, the tenant must repair the damage and restore the appearance of the premises by redecorating. However, the landlord may elect to undertake the repair or redecoration, and in such case the tenant must reimburse the landlord for the reasonable cost thereof; the cost to the landlord is presumed reasonable unless proved otherwise by the tenant.

Wis. Stat. § 704.07(3)(a).

¶ 118. Finally, the statute provides for the situation in which the premises become untenantable without the fault of either the landlord or the tenant:

If the premises become untenantable because of damage by fire, water or other casualty or because of any condition hazardous to health, or if there is a substantial violation of sub. (2) materially affecting the

health or safety of the tenant, the tenant may remove from the premises *unless the landlord proceeds promptly to repair or rebuild or eliminate the health hazard or the substantial violation of sub. (2) materially affecting the health or safety of the tenant;* or the tenant may remove if the inconvenience to the tenant by reason of the nature and period of repair, rebuilding or elimination would impose undue hardship on the tenant. If the tenant remains in possession, rent abates to the extent the tenant is deprived of the full normal use of the premises. This section does not authorize rent to be withheld in full, if the tenant remains in possession. If the tenant justifiably moves out under this subsection, the tenant is not liable for rent after the premises become untenantable and the landlord must repay any rent paid in advance apportioned to the period after the premises become untenantable. *This subsection is inapplicable if the damage or condition is caused by negligence or improper use by the tenant.*

Wis. Stat. § 704.07(4) (emphasis added).

¶ 119. The court of appeals acknowledged that the statute "does not explicitly spell out whose duty it is to repair damages caused by a fire when the premises are damaged by something other than the landlord's negligence or intentional act, or the tenant's negligence or improper use." *Maryland Arms Ltd. P'ship v. Connell,* 2009 WI App 87, ¶ 9, 320 Wis. 2d 147, 769 N.W.2d 145. However, the court reasoned that "the only logical conclusion" is that "landlords are obligated to repair the premises when the fire damage was not caused by the landlord's negligence or intentional act or the tenant's negligence or improper use of the premises." *Id.*

¶ 120. Following this logic, the court of appeals incorrectly concluded that Wis. Stat. § 704.07(3) provides the *only* circumstance in which the tenant has a duty to repair. *Maryland Arms,* 320 Wis. 2d 147, ¶ 7.

Accordingly, it added, the lease provision was unenforceable because it attempted to waive the requirements of § 704.07. Furthermore, the court of appeals reasoned, based on the Judicial Council Note to the statute, the legislature intended "to prohibit generally worded clauses in a lease from overriding the statute." *Id.*, ¶ 13. Because this line of reasoning places a restriction on residential leases that is not present in the statute, I cannot agree with the court of appeals' interpretation of the statute.

¶ 121. Statutory interpretation begins with the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. If the language of the statute is plain, we inquire no further. *Id.* When interpreting the language of the statute, we read the language "not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46.

¶ 122. A close reading of § 704.07 reveals that it does not prohibit parties from allocating liability as the parties did in this lease.

¶ 123. Neither § 704.07(2) (duties of the landlord) nor § 704.07(3) (duties of the tenant) applies in this case. Section 704.07(2) does not apply because the damage was "not the result of the negligence or intentional act of the landlord." § 704.07(2)(c). Section 704.07(3) does not apply because the premises were not "damaged by the negligence or improper use of the premises by the tenant." § 704.07(3)(a).

¶ 124. Section 704.07(4) sets out the situation in which the premises become untenantable. In that event, the tenant may remove (1) *unless* the landlord promptly rebuilds or repairs; or (2) if the repair would

cause an undue hardship on the tenant. *Id.* If the tenant chooses to remain on the premises, rent is abated "to the extent the tenant is deprived of the full normal use of the premises." *Id.* If the tenant moves out, she is no longer liable for rent. *Id.*

¶ 125. In summary, § 704.07 as a whole describes three potential circumstances: (1) if the damage is caused by the landlord's negligence or intentional act, the landlord has a duty to repair; (2) if the damage is caused by the tenant's negligence or improper use of the premises, the tenant has a duty to repair (or pay for repair); (3) if the premises become untenantable, the tenant may remove *unless* the landlord repairs, and may abate rent. Wis. Stat. § 704.07(4).

¶ 126. Nothing in the language or structure of § 704.07 suggests that § 704.07(3) sets out the *only* circumstance in which the tenant may be liable for damages caused by fire. The court of appeals reasoned that this was the "only logical conclusion" based on the various landlord duties imposed by the statute. The statute, however, does not impose a duty to repair on the landlord when fire damage was caused by something other than the landlord's negligence or improper act. It merely allows the tenant to abate rent or remove unless the landlord repairs, *if* the fire renders the premises untenantable.

¶ 127. The specific circumstances of § 704.07(4) are not present in this case. Neither the pleadings nor the stipulation indicates that the fire rendered the premises untenantable. It appears that Maryland Arms repaired the property and subsequently billed Cari for the amount of repair. It does not appear that Cari invoked either of the remedies in § 704.07(4): removal or rent abatement. Thus, even if § 704.07(4) prohibited contractual allocation of liability where damage ren-

dered the premises untenantable, that prohibition would not apply to these facts because there is no indication that the fire rendered the premises untenantable.

¶ 128. There are two additional provisions in chapter 704 that illuminate § 704.07(4). Wisconsin Stat. § 704.05(1) reads as follows:

> (1) *When section applicable.* So far as applicable, this section governs the rights and duties of the landlord and tenant *in the absence of any inconsistent provision in writing signed by both the landlord and the tenant.* This section applies to any tenancy.

Wis. Stat. § 704.05(1) (emphasis added). This section acknowledges the parties' ability to define their rights with respect to one another by contract. Although the language applies specifically to § 704.05, the underlying principle carries over to § 704.07. Thus, so long as the parties do not waive the requirements of § 704.07, the freedom of contract embodied in § 704.05 permits them to allocate risk by the terms of the lease.

¶ 129. The second provision that sheds light on the proper interpretation of § 704.07 is Wis. Stat. § 704.09(2). Section 704.09 governs the transfer of the landlord's or tenant's interest in the property. Section 704.09(2) states: "In the absence of an express release or a contrary provision in the lease, transfer or consent to transfer does not relieve the transferring party of any contractual obligations under the lease, except" in a specified situation. Thus, while § 704.09(2) does not explicitly address rights under § 704.07, it supports the proposition that a tenant's liability under a lease continues even when the tenant is no longer in possession of the premises. Read together with § 704.07(4), it clarifies that § 704.07(4) does not limit the parties'

ability to allocate risk for damage. A tenant may remove from the property under § 704.07(4), in which case the tenant will no longer be liable for *rent*. Section 704.07(4) does not, however, relieve a tenant of other liability she may have incurred under the lease.

¶ 130. Because nothing in Wis. Stat. § 704.07 imposes a duty on a party to repair damage that was not caused by the landlord's negligent or intentional act or the tenant's negligence or improper use of the premises, the lease provision at issue is not prohibited by the statute's command that "[a]n agreement to waive the requirements of this section in a residential tenancy is void." Wis. Stat. § 704.07(1). The statute leaves open the opportunity for landlords and tenants to allocate liability in such situations as they see fit.

¶ 131. The Apartment Association of South Central Wisconsin, Inc., Apartment Association of Southeastern Wisconsin, Inc., Central Wisconsin Apartment Association, and Lakeshore Apartment Association, Inc. contend that the court of appeals decision will have negative consequences for landlords throughout the state because it "assign[s] blanket *legal* responsibility for certain apartment damages to a landlord, regardless of whether the damages were *caused* by that landlord." As a result, landlords are made responsible for such losses, even when they "(1) are not in possession of the property, (2) are not in control of the instrumentality causing the damages, and (3) are otherwise wholly innocent with regard to the damages."

¶ 132. This case presents an important issue of statutory interpretation that will have widespread effect on residential leases in Wisconsin. The majority has failed to address this issue, limiting its attention to the language of the specific lease at hand. Furthermore, it has exacerbated the problem identified by the apart-

349

ment associations by misinterpreting unambiguous language in the lease and creating a de facto rule of landlord responsibility, even where the parties agree otherwise. This decision will increase insurance premiums for landlords who will now be responsible for damages caused by factors beyond their control. Renters throughout the state will, in turn, bear this burden in the form of increased rent.

## CONCLUSION

¶ 133. In sum, the lease provision at issue clearly and unambiguously renders the tenant liable for damage to the premises resulting from the fire caused by her acts of bringing the hair dryer into the apartment, plugging it in, and leaving it plugged in overnight, or longer. Wisconsin Stat. § 704.07 does not preclude a residential lease from allocating liability for damage to the tenant's premises caused by neither the negligence of the landlord nor the negligence of the tenant. The decision of the court of appeals should be reversed. Because the majority concludes otherwise, I respectfully dissent.

¶ 134. I am authorized to state that Justice MICHAEL J. GABLEMAN joins this dissent.